**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**


DAVID J. WOJCIK, DENISE J. WOJCIK, )
and SALADS OF SCHAUMBURG, INC., )
)
           Plaintiffs, )
)
           v. )
)
INTERARCH, INC., a New Jersey corporation, )    Case No. 13-cv-1332
SITE DEVELOPMENT, INC., a New Jersey )
Corporation, and SALADWORKS, LLC, and )
PAUL STECK, PATRICK PANTANO, JOHN )
SCARDAPANE, and JOHN MATTES, )
Individuals, )
)
           Defendants. )

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

On June 7, 2013, Plaintiffs David Wojcik, Denise Wojcik and Salads of Schaumburg,

Inc. filed a seven-count Second Amended Complaint ("Complaint") against Saladworks, LLC,

several current or former Saladworks' employees (the "Individual Defendants" or, collectively

with Saladworks, the "Saladworks Defendants"), Site Development, Inc. ("SDI") and InterArch,

Inc. (R. 23, SAC.)  Plaintiffs voluntarily dismissed InterArch with prejudice on August 20,

2013.  (R. 62.)  With respect to the remaining Defendants, Plaintiffs allege violations of the

Illinois Franchise Disclosure Act and Illinois Consumer Fraud Act (Counts I-II), common-law

fraud (Count III), conspiracy to commit fraud (Count IV) and breach of contract (Count VII)

against the Saladworks Defendants and negligent misrepresentation (Count VI) and conspiracy

to commit fraud (Count IV) against SDI.  Before the Court are the Saladworks Defendants'

motion to dismiss (R. 53), SDI's motion to dismiss (R. 30), and Plaintiffs' motion to strike the exhibits attached to Defendants' briefs and all arguments based on those exhibits (R. 47). For the following reasons, the Court grants in part and denies in part the Saladworks Defendants' and SDI's motions to dismiss without prejudice, and grants in part and denies in part Plaintiffs' motion to strike.

**BACKGROUND**

Plaintiffs allege the following facts, which the Court must accept as true for purposes of Defendants' motions to dismiss.

## I.       The Parties

Plaintiff Salads of Schaumburg, Inc. is an Illinois corporation with its principal place of business in Schaumburg, Illinois. (SAC ¶ 3.) David Wojcik ("Wojcik") is the president and majority shareholder of Salads of Schaumburg, and his wife, Denise Wojcik, is the treasurer and only other shareholder of the company. (*Id.* ¶¶ 1-2.) The Wojciks are both Illinois citizens. (*Id.*)

Defendant Saladworks is a Delaware limited liability company with its principal place of business in Conshohocken, Pennsylvania. (*Id.* ¶ 6.) It franchises Saladworks' restaurants, which offer made-to-order salads and a variety of sandwiches, wraps, paninis, soups, and other breads and beverages. (*Id.* ¶ 18.) Plaintiffs allege on information and belief that all members of Saladworks are citizens of Pennsylvania. (*Id.* ¶ 6.) Defendant SDI is a commercial real estate firm that specializes in development and site location needs for franchise operators, and it is the designated real estate firm for Saladworks' franchises. (*Id.* ¶¶ 5, 24(a).) SDI is a New Jersey corporation with its principal place of business in Mount Laurel, New Jersey. (*Id.* ¶ 5.) The other remaining Defendants are current or former Saladworks' employees, all of whom, Plaintiffs allege on information and belief, are citizens of Pennsylvania. (*Id.* ¶¶ 7-10.)

## II.     Wojcik and Saladworks Enter into a Franchise Agreement

In 2011, after researching various franchise opportunities, Wojcik contacted Saladworks about potentially opening a Saladworks' franchise in the Chicago area.  (*Id.* ¶ 19.)  Saladworks provided Wojcik with its current Franchise Disclosure Document ("FDD"), dated March 8, 2011, and invited Wojcik to attend a "discovery day" at Saladworks' offices in Pennsylvania.  (*Id.* ¶¶ 19-20.)

During discovery day, Wojcik met with Saladworks' employees, including three of the Individual Defendants (Steck, Pantano and Mattes), who interviewed him to determine his qualifications to be a franchisee, reviewed portions of the FDD with him, and discussed the possibility of Wojcik opening one or more Saladworks restaurants in the Chicago area.  (*Id.* ¶¶ 23-28.)  Discovery day also included a visit to a nearby Saladworks restaurant, known as the "Gateway Restaurant," which Individual Defendants Pantano and Mattes described as a typical Saladworks restaurant in terms of physical appearance and menu offerings.  (*Id.* ¶ 24.)  Pantano and Mattes explained that Saladworks' designated commercial real estate firm, SDI, and architecture firm, InterArch, would help Wojcik find a location and design his restaurant if he became a franchisee.  (*Id.*)

On July 7 or 8, 2011, Wojcik, in reliance on representations Saladworks made in the FDD and during discovery day, entered a franchise agreement (the "Franchise Agreement") and an agreement for multi-unit operators (the "Multi-Unit Development Agreement") with Saladworks to allow Wojcik to develop three Saladworks restaurants in the greater Chicago area.  (*Id.* ¶¶ 32-33.)  According to Wojcik, Individual Defendant Mattes told Wojcik that he would waste his money paying a lawyer to review the agreements because the terms were non-negotiable.  (*Id.* ¶ 35.)  Around this time, Denise Wojcik invested $90,000 in the franchise in reliance on

Saladworks' representations, which her husband had communicated to her.  (*Id.* ¶ 33.)  Wojcik used his wife's investment to pay the Saladworks' franchise fee.  (*Id.* ¶ 34.)

Wojcik claims that Saladworks made numerous misrepresentations and omissions in its FDD and other sales materials that induced him to purchase a Saladworks' franchise.  (*Id.* ¶¶ 37-41.)  According to Wojcik, Saladworks misrepresented, among other things, that "Saladworks had the experience and expertise to support a franchisee's introduction of its brand in the Chicago market and that Saladworks would be committed to success in this market" (*id.* ¶ 37(a)); "Wojcik's Illinois restaurants would basically replicate what he saw on discovery day at the Gateway Restaurant" (*id.* ¶ 37(b)); InterArch and SDI "would be . . . strong positive factor[s]" in helping him develop his restaurants (*id.* ¶ 37(d), (f)); and Wojcik "would receive a 'standard location,'" thus making the financial information Saladworks included in its FDD for franchised restaurants at "standard locations" relevant and meaningful for him (*id.* ¶ 39(c)(i)).  Wojcik also alleges that Saladworks omitted a number of material facts, including the following:

(1) Saladworks based the projected construction costs disclosed in its FDD on "site locations that did not require any substantial changes in use, *e.g.,* that . . . previously [had] a restaurant on the site . . . ."  (*Id.* ¶ 37(c).)

(2) "[W]ithin any market there can be material differences between particular sites that will substantially affect the performance of any particular franchise, such that, by inducing franchisees to believe that he or she would receive a 'standard location,'" the franchisee was being misled and deceived into believing that SDI and Saladworks had developed some sort of process that eliminated the risk of poor site selection . . . ."  (*Id.* ¶ 38(d)(ii).)

(3) InterArch—Saladworks' designated architect—"had insufficient familiarity with the local building codes of Schaumburg or the other Illinois communities in which Wojcik was planning to build and InterArch was not licensed in Illinois."  (*Id.* ¶ 37(e).)

(4) "[The Saladworks] brand was most successful in a core market area, which included the area covered by an approximate 250-mile radius of Philadelphia . . . . [but] beyond the core market area, most of [Saladworks'] franchises were substantially under-performing in relationship to those that were located within the core market area," thus making  Saladworks' disclosures about the financial performance of

franchised restaurants at "standard locations" deceptive and misleading to a franchisee in Illinois.  (*Id.* ¶ 38(d)(i).)

(5)  The two restaurants for which Saladworks supplied information about average operating costs obtained free labor from new franchisees in training, thus making the average operating costs Saladworks disclosed in its FDD materially misleading.  (*Id.* ¶ 40.)

(6)  Saladworks "did not intend to do 'brand development advertising' in Illinois," and thus, a franchisee in Illinois would receive no benefit from its required contributions to Saladworks' "Brand Development Fund."  (*Id.* ¶ 41.)

(7)  InterArch, Saladworks' designated architecture firm, charged a $5,000 "supervision fee," in addition to its design fee, if the franchisee chose to have InterArch supervise construction of the restaurant.  (*Id.* ¶¶ 68-70.)

Plaintiffs allege that if not for Saladworks' misrepresentations and omissions, Wojcik would not have entered into the Franchise Agreement or paid Saladworks the $90,000 franchise fee.  (*Id.* ¶¶ 42-43.)

## III.    Wojcik Develops His First Saladworks Restaurant

After entering the Franchise Agreement, Wojcik began preparing to open his first Saladworks restaurant.  (*See id.* ¶¶ 45-95.)  Wojcik contends that Defendants' misrepresentations and omissions during various stages of this process doomed his restaurant before it even opened.

### A.    Site Selection

Three of the Individual Defendants (Steck, Pantano and Scardapane) and John Silvestri of SDI traveled to Illinois to help Wojcik review potential sites for his first Saladworks restaurant. (*Id.* ¶ 50.)  During the trip, the group visited potential sites, reviewed listing information for the sites and demographics of the surrounding areas, discussed what Saladworks and SDI looked for in potential sites, and observed customer traffic at competing restaurants in the area.  (*Id.* ¶ 50.) The group, including Wojcik, ultimately selected a vacant property in the Streets of Woodfield mall for the site of his first restaurant.  (*Id.* ¶ 52.)  Wojcik alleges that he relied on the Individual Defendants' and SDI's apparent site selection expertise in choosing the location.  (*Id.* ¶ 51.)

Wojcik claims that the Saladworks Defendants and SDI omitted several material facts during the site selection process. First, Defendants failed to disclose that the previous tenant had used the site as a retail store, not a restaurant, which would significantly increase Wojcik's build-out costs. (*Id.* ¶¶ 53-54.) Second, Defendants failed to disclose that the site's seating capacity was too low to allow Wojcik to generate enough sales to turn a profit. (*Id.* ¶ 59.) According to Wojcik, Defendants should have known, based on the average turnover rate at most Saladworks restaurants and "simple arithmetic," that the site would have too few seats to generate a profit. (*Id.* ¶¶ 60-61.) Third, Defendants failed to disclose that Wojcik should expect a drop-off in business in the cold weather months. (*Id.* ¶ 63.)

### B.    Restaurant Design and Construction

Saladworks required Wojcik to hire InterArch to design his restaurant. (*Id.* ¶ 24(b).) Wojcik claims that InterArch's design differed significantly from the design of the Gateway Restaurant, which the Saladworks Defendants had represented as a "typical" Saladworks design. (*Id.* ¶ 64.) InterArch's design did not include a self-serve soda fountain like the Gateway Restaurant and had one point-of-sale register, while the Gateway Restaurant had two. (*Id.* ¶¶ 64, 67.) Wojcik discussed these issues with the Saladworks Defendants. Saladworks informed Wojcik that it had changed its format to require the sale of bottled beverages, instead of fountain drinks. (*Id.* ¶¶ 65-66.) Saladworks also informed Wojcik that the "standard" design included only one point-of-sale register and then charged him an additional $4,000 to install a second register. (*Id.* ¶¶ 89-90.)

Wojcik hired InterArch to supervise the construction of his Saladworks restaurant. (*Id.* ¶¶ 68-70, 75.) The bids InterArch received for the construction project were $100,000 to $120,000 higher than Wojcik had expected based on Defendants' representations. (*Id.* ¶ 77.)

Wojcik claims that Saladworks' FDD materially underestimated the projected build-out costs by relying on "'perfect' site locations where all utilities met design criteria, and where no demolition was required to re-design previously existing bathroom facilities." (*Id.* ¶ 78(a).)

Additionally, Wojcik claims that InterArch's failure to comply with the terms of Wojcik's lease led to several design flaws, increased construction costs, and caused delays. (*Id.* ¶ 79.) Wojcik alleges on information and belief that "many if not all the cost overruns that [he] sustained in the build-out process were a direct result of the fact that Wojcik was required to use InterArch as the designated Architects; yet they were not licensed in Illinois and had zero familiarity with the local building codes of Schaumburg." (*Id.* ¶ 72.)

## C. Business Plan

Several weeks before his store opened, Wojcik prepared a business plan to cover the operations of his restaurant. (*Id.* ¶ 85.) Wojcik claims that the labor and food costs Saladworks disclosed in its FDD, which he relied on to create his business plan, substantially understated typical labor and food costs. (*Id.* ¶ 86.) Because of those increased costs, "Wojcik's projected break-even point was not attainable . . . ." (*Id.*) Saladworks' business coach, however, told Wojcik during new franchisee training that his business plan summary "looked okay." (*Id.*)

## D. Financing

Wojcik obtained a small business loan from The First Bank of Colorado to finance his start-up costs. (*Id.* ¶ 94.) Denise Wojcik co-signed for the loan. (*Id.*) In the course of trying to obtain financing for the restaurant, a loan officer for one of the banks Wojcik had approached informed him that Saladworks had a poor track record with a large number of franchisee defaults. (*Id.* ¶ 95.) The loan officer showed Wojcik a report stating that Saladworks franchisees have a 35% default rate. (*Id.*) Having read in Saladworks' FDD that only 10% of Saladworks

restaurants closed in the last three years, Wojcik contacted Pantano to ask about the default rate. (*Id.*)  Pantano assured Wojcik that the default rate in the report was inflated because some franchisees defaulted on account of business investments unrelated to their Saladworks restaurants.  (*Id.*)

## IV.    Wojcik's Restaurant Shut Down After Six Months

Wojcik's Saladworks restaurant opened on May 21, 2012, and struggled from the start. (*Id.* ¶ 96.)  Wojcik realized soon after opening that the lack of seating at his store was a "big issue."  (*Id.* ¶ 103.)  On numerous occasions, potential customers left the restaurant because they had nowhere to sit.  (*Id.* ¶ 104.)  Additionally, during the week after Wojcik's restaurant opened, Saladworks' business coach informed Wojcik for the first time that "his food and labor costs would be much higher than normal for the first couple months until Wojcik and his staff could get a handle on their labor and food usage."  (*Id.* ¶ 101.)  Wojcik tried various local marketing campaigns to improve the viability of his business with little success, but he received no assistance from Saladworks through its brand development fund.  (*Id.* ¶¶ 105-07, 109, 115-17.) Although Wojcik acknowledges that the Franchise Agreement did not require Saladworks to give him equal brand development funding, he "thought that [Saladworks] would at least spend some funds on launching a new market."  (*Id.* ¶ 117.)  In the fall of 2012, Denise Wojcik invested an additional $13,000 in Salads of Schaumburg, Inc. to fund the restaurant's continuing operations. (*Id.* ¶ 108.)

Saladworks evaluated Wojcik's restaurant in mid-October 2012, and designated Wojcik an "A" operator.  (*Id.* ¶ 118.)  Although, according to the FDD, an "A" operator should average between $710,000 and $984,000 in annual sales, Wojcik's restaurant was on pace to net less than $450,000 in its first year.  (*Id.*)  Wojcik closed the restaurant on November 30, 2012.  (*Id.* ¶ 120.)

V.      **Procedural History**

Plaintiffs assert five counts against the Saladworks Defendants based on their alleged fraud (Counts I-IV) and breaches of contract (Count VII) and two counts against SDI for conspiracy to commit fraud (Count IV) and negligent misrepresentation (Count VI). Plaintiffs also asserted one count against InterArch for negligent misrepresentation (Count V), but subsequently settled with InterArch and voluntarily dismissed it from the case. (R. 61-62.)

The Saladworks Defendants and SDI both moved to dismiss Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(6). (R. 30, 53.) In addition to attacking the Complaint for failure to state a claim, Defendants argue that Plaintiffs previously released all claims they may have against Saladworks, thus barring their suit. (*See* Saladworks Mem. at 5-12; SDI Mem. at 8-10.) Defendants attached the contracts containing Plaintiffs' releases, the Franchise Agreement, and the Multi-Unit Development Agreement to their motions to dismiss.[1] (R. 55, Rubenstein Decl. at Ex. A-E; SDI Mem. at Ex. A-B.) Plaintiffs moved to strike the exhibits and all arguments based on them. (R. 47, Mot. to Strike.)

## LEGAL STANDARD

I.      **Federal Rule of Civil Procedure 12(b)(6)**

"A motion under Rule 12(b)(6) tests whether the complaint states a claim on which relief may be granted." *Richards v. Mitcheff,* 696 F.3d 635, 637 (7th Cir. 2012). Under Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The short and plain statement under Rule 8(a)(2) must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell*

---

[1]  SDI submitted only the December 21, 2011 Transfer Agreement and the Addendum to its motion to dismiss. (*See* SDI Mem. at Ex. A-B.) For convenience, the Court uses the exhibit letters used in the Declaration of Gregg A. Rubenstin in support of the Saladworks Defendants' motion to dismiss when referring to specific exhibits.

*Atl. v. Twombly,* 550 U.S. 544, 555, 126 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (citation omitted).

Under the federal notice pleading standards, a plaintiff's "factual allegations must be enough to

raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555.  Put differently, a

"complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that

is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed.

2d 868 (2009) (quoting *Twombly,* 550 U.S. at 570).  "In evaluating the sufficiency of the

complaint, [courts] view it in the light most favorable to the plaintiff, taking as true all well-

pleaded factual allegations and making all possible inferences from the allegations in the

plaintiff's favor." *AnchorBank, FSB v. Hofer,* 649 F.3d 610, 614 (7th Cir. 2011).

## II.     Federal Rule of Civil Procedure 9(b)

In pleading fraud in federal court, Rule 9(b) imposes a higher pleading standard than that

required under Rule 8(a)(2).  *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v.

Walgreen Co.,* 631 F.3d 436, 446 (7th Cir. 2011).  Specifically, Rule 9(b) requires a pleading to

state with particularity the circumstances constituting the alleged fraud.  *See* Fed. R. Civ. P. 9(b);

*Pirelli,* 631 F.3d at 441-42; *see also Iqbal,* 556 U.S. at 686.  This "ordinarily requires describing

the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that

is required will necessarily differ based on the facts of the case." *AnchorBank,* 649 F.3d at 615

(citation omitted); *see also Cincinnati Life Ins. Co. v. Beyrer,* 722 F.3d 939, 948 (7th Cir. 2013).

"Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

Fed. R. Civ. R. 9(b); *see also Iqbal,* 556 U.S. at 686.  "[T]he particularity requirement of Rule

9(b) is designed to discourage a 'sue first, ask questions later' philosophy." *Pirelli,* 631 F.3d 441

(citation omitted).  "Heightened pleading in the fraud context is required in part because of the

potential stigmatic injury that comes with alleging fraud and the concomitant desire to ensure

that such fraught allegations are not lightly leveled." *Beyrer,* 722 F.3d at 948 (quoting *Pirelli,* 631 F.3d at 442).

## ANALYSIS

### I.   Plaintiffs' Motion to Strike

Generally, in deciding a motion to dismiss, courts look only to matters within the four corners of the complaint. *See* Fed. R. Civ. P. 12(d); *Tierney v. Vahle,* 304 F.3d 734, 738-39 (7th Cir. 2002). The Seventh Circuit recognizes limited exceptions to Rule 12(d), however, for "documents attached to the complaint, documents that are critical to the complaint and referred to in it" and "information that is subject to proper judicial notice." *Geinosky v. City of Chicago,* 675 F.3d 743, 745 n.1 (7th Cir. 2012). "The purpose . . . is to prevent parties from surviving a motion to dismiss by artful pleading or by failing to attach relevant documents." *188 LLC v. Trinity Indus., Inc.,* 300 F.3d 730, 735 (7th Cir. 2002); *Tierney,* 304 F.3d at 738 ("[W]ere it not for the exception, the plaintiff could evade dismissal under Rule 12(b)(6) simply by failing to attach to his complaint a document that proved that his claim had no merit."). The classic example of a document falling within the exception is a contract in a breach of contract suit. *Tierney,* 304 F.3d at 738. If a court looks to documents other than the complaint and those that fall within the limited exceptions to Rule 12(d), the court must convert the motion to one for summary judgment under Rule 56. *See* Fed. R. Civ. P. 12(d); *Wright v. Assocs. Ins. Cos.,* 29 F.3d 1244, 1248 (7th Cir. 1994); *Ennenga v. Starns,* 677 F.3d 766, 773 (7th Cir. 2012). With respect to the "incorporation by reference" exception,

Defendants attached several documents to their motions to dismiss to support their argument that Plaintiffs released their claims against Saladworks: (1) the Franchise Agreement (R. 55, Rubenstein Decl. at Ex. A); (2) the Multi-Unit Development Agreement (*id.* at Ex. B); (3)

two agreements dated September 13, 2011 and December 21, 2011, which transferred the

Franchise Agreement and Multi-Unit Development Agreement to a new franchisee ("Transfer

Agreements") (*id.* at Ex. C, D); and (4) an addendum to the Multi-Unit Development Agreement

dated April 2, 2012, which granted Salads of Schaumburg a six-month extension to open its

second restaurant ("Addendum") (*id.* at Ex. E).  The Transfer Agreements and the Addendum

contain the general releases on which Defendants rely. (*See* Transfer Agreements ¶ 3; Addendum

¶ 2.)

Plaintiffs move to strike the exhibits and all arguments based on them from Defendants'

motions to dismiss.  (R. 47, Mot. to Strike.)  Plaintiffs argue that Defendants' "attempt . . . to

stretch the 'incorporation by attachment' rule to documents that were not attached [to the

Complaint] is unprecedented and patently absurd."  (*Id.* at 2; *see also* R. 50 at 8; R. 63 at 6.)

Plaintiffs also argue that even if the Court considers the exhibits, factual issues surrounding

Plaintiffs' purported releases—including Saladworks procured the releases through fraud—

prevent the Court from dismissing Plaintiffs' claims.  (Mot. to Strike at 2; R. 50 at 8; R. 63 at 6-

14.)

**A.      The Franchise Agreement and Multi-Unit Development Agreement**

Defendants argue that the Court may consider the Franchise Agreement and Multi-Unit

Development Agreement because Plaintiffs incorporated these documents into the Complaint by

reference.  (Saladworks Mem. at 5; SDI Memo. at 8; SDI Reply at 4.)  The Court agrees with

respect to the Franchise Agreement.  The Complaint repeatedly refers to the Franchise

Agreement, which serves as the basis of Plaintiffs' breach of contract claim.  (*See, e.g.,* SAC ¶¶

32, 35, 37, 173-80.)  It is therefore central to Plaintiffs' claims, and falls within the

incorporation-by-reference exception.  *See, e.g., Tierney,* 304 F.3d at 738 (noting that

incorporation-by-reference doctrine typically involves a contract in a breach of contract action); *Levenstein v. Salafsky,* 164 F.3d 345, 347 (7th Cir. 1998) (same); *see also Gillis v. Meisner,* No. 12-3928, 2013 WL 2422682, at *2 (7th Cir. May 31, 2013) (court properly considered the contents of the parties' settlement agreement in dismissing the plaintiff's claim for breach of that agreement).

The Multi-Unit Development Agreement, however, does not fall within the exception. In the 180-paragraph Complaint, Plaintiffs make only two passing references to the Multi-Unit Development Agreement. (*See* SAC ¶¶ 32, 35.) Plaintiffs do not quote or even discuss the terms of the Multi-Unit Development Agreement in the Complaint, nor do they rely on the Multi-Unit Development Agreement to plead their breach of contract count. (*See id.* ¶¶ 173-80.) Although mentioned in the Complaint, the Multi-Unit Development Agreement is not central to Plaintiffs' claims, and therefore, it falls outside the incorporation-by-reference doctrine. *See Williams v. Time Warner Inc.,* 440 Fed. App'x 7, 9 (2d Cir. 2011) ("A mere passing reference or even references . . . to a document outside of the complaint does not, on its own, incorporate the document into the complaint itself."); *see also Rogers v. Garcia,* No. 08-cv-02821-WYD-MJW, 2010 WL 3547432, at *2 (D. Col. Sept. 3, 2010) ("[T]he Second Amended Complaint's passing references to [the document at issue] do not . . . make it central to Plaintiff's claims."); *Thomas v. Westchester County Health Care Corp.,* 232 F. Supp. 2d 273, 275-76 (S.D.N.Y. 2002) (finding that a brief reference to a report in one paragraph of the complaint was insufficient to meet the incorporation by reference exception).

### B.     The Transfer Agreements and Addendum

Defendants argue that because the Court may consider the Franchise Agreement and Multi-Unit Development Agreement in ruling on Defendants' motions, it also may consider the

Transfer Agreements and Addendum, which modify and "are incorporated into" the Franchise Agreement, even though the Complaint does not specifically mention the Transfer Agreements or Addendum. (*See* Saladworks Mem. at 5; SDI Mem. at 8 n.1; SDI Reply at 4-5.) SDI cites the Seventh Circuit's opinion in *Hecker v. Deere & Co.,* 556 F.3d 575 (7th Cir. 2009), in support of this argument.

In *Hecker*, an ERISA case, the plaintiffs sued their employer and the plans' trustee and investment advisor for breach of fiduciary duty based, in part, on the defendants' failure to disclose a profit sharing arrangement between the trustee and investment advisor. 556 F.3d at 580-81. The district court, in ruling on the defendants' motions to dismiss, considered several documents that the defendants had attached to their motions, including seven Summary Plan Descriptions and two supplements to the Summary Plan Descriptions, to show what the defendants disclosed to the plaintiffs. *Id.* at 582. Though the complaint explicitly referred to the Summary Plan Descriptions in the complaint, it made no mention of the supplements. *Id* at 583.

The Seventh Circuit held that the district court's consideration of the Summary Plan Descriptions and supplements was proper. *Id.* at 582-83. First, the Summary Plan Descriptions fit into the incorporation-by-reference exception because the complaint explicitly referred to them, and they "reveal[ed] the disclosures that [the employer] made to the Plan participants." *Id.* Next, the court determined that the supplements to the Summary Plan Descriptions also fit within the exception because, "while not mentioned separately in the Complaint, [they] serve much the same purpose as the originals." *Id.* at 583. In sum, even if the complaint does not explicitly mention an exhibit, the court may consider the exhibit on a motion to dismiss if (1) the exhibit supplements or amends another document properly before the court and (2) the defendant relies

on the exhibit for the "same purpose" that made the underlying document central to the plaintiff's claims. *See id.* at 582-83.

Neither the Transfer Agreements nor the Addendum that Defendants attached to their motions to dismiss fulfill these requirements. First, because the Court cannot consider the Multi-Unit Development Agreement, it also cannot consider the Addendum amending the Multi-Unit Development Agreement under the first *Hecker* requirement.

Defendants' reliance on the Transfer Agreements and the Addendum also fails the "same purpose" test. Defendants argue that the Court may consider these agreements because they amend the Franchise Agreement. (*See* SDI Reply at 5.) Defendants, however, do not rely on the agreements for the amendments they made to the Franchise Agreement; they rely on them for the general releases Plaintiffs provided as consideration. *Cf. Truhlar v. John Grace Branch No. 825 of the Nat'l Ass'n of Letter Carriers,* No. 06 C 2232, 2007 WL 1030237, at *8-9 (N.D. Ill. Mar. 30, 2007) ("The court is aware of no authority holding that consideration of extraneous material on a motion to dismiss is proper" if the document "is 'central' not to Plaintiff's claim, but to Defendant's affirmative defense."). The agreements, therefore, fail to meet the second *Hecker* requirement.

Accordingly, mindful of the Seventh Circuit's warning that the "limited" incorporation-by-reference exception is "not intended to grant litigants license to ignore the distinction between motions to dismiss and motions for summary judgment,"[2] the Court grants Plaintiffs' motion to strike the Multi-Unit Development Agreement, the Addendum, and the Transfer Agreements

---

[2] *See Levenstein,* 164 F.3d at 347; *see also Albany Bank & Trust Co. v. Exxon Mobil Corp.,* 310 F.3d 969, 971 (7th Cir. 2002) (Although a court may consider documents that the plaintiff refers to if the documents are central to the plaintiff's claims, "the converse is also true: documents that are neither included in the plaintiff's complaint nor central to the claim should not be considered on a motion to dismiss.").

along with the arguments based on those agreements from Defendants' briefs. The Court denies

Plaintiffs' motion to strike with respect to the Franchise Agreement.

II.      **The Saladworks Defendants' Motion to Dismiss**

The Saladworks Defendants move to dismiss Plaintiffs' claims against them on three

grounds. First, the Saladworks Defendants argue that the general releases contained in the

Transfer Agreements and the Addendum bar Plaintiff's claims as a matter of law. (*See*

Saladworks Mem. at 5-12.) Second, the Saladworks Defendants argue that Plaintiffs' breach of

contract claim fails, in part, because "the covenant of good faith and fair dealing cannot vary the

specific terms of a contract." (*Id.* at 11-12; *see also* Saladworks Reply at 4-5.) Third, the

Saladworks Defendants contend that David and Denise Wojcik have no standing to assert claims

in their individual capacities. (*See* Saladworks Mem. at 12-13.)

A.      **Defendants' Release Argument Is Premature**

A release provides an affirmative defense. *See* Fed. R. Civ. P. 8(c)(1). A plaintiff need

not plead facts in the complaint to anticipate and defeat potential affirmative defenses.

*Independent Tr. Corp. v. Stewart Info. Servs. Corp.,* 665 F.3d 930, 935 (7th Cir. 2012). "[I]f the

allegations of the complaint itself set forth everything necessary to satisfy [an] affirmative

defense," however, the plaintiff pleads himself out of court. *See Brooks v. Ross,* 578 F.3d 574,

579 (7th Cir. 2009). Defendants argue that the documents attached to their motions to dismiss—

which, according to Defendants, Plaintiffs incorporated into the Complaint by reference—set

forth everything they need to show that Plaintiffs released their claims against Saladworks. (*See*

Saladworks Mem. at 5-12.) Because the Court has stricken those documents (*see* Part I *supra*),

though, and the Complaint itself does not mention the releases, Defendants' argument fails. *See*

*Solis v. Caro, N.C.,* No. 11 C 6884, 2012 WL 1409558, at *3 (N.D. Ill. Apr. 23, 2012); *George v. Kraft Foods Global, Inc.,* 674 F. Supp. 2d 1031, 1041-42 (N.D. Ill. 2009).

### B.    Plaintiffs Sufficiently Plead a Breach of Contract Claim

Plaintiffs allege that Saladworks breached the implied covenant of good faith and fair dealing in the Franchise Agreement in several respects: by requiring Plaintiffs to work which InterArch, requiring Plaintiffs to serve bottled beverages instead of fountain drinks, failing to spend sufficient funds on brand development in the Chicago market, failing to provide sufficient support to Plaintiffs, and failing to deliver a successful franchise "system" for operating a restaurant.  (*See* SAC ¶¶ 175-79.)  In their motion to dismiss, the Saladworks Defendants argue that Plaintiffs cannot rely on alleged breaches of the implied covenant here because "each of the alleged 'breaches' is addressed by specific provisions" of the Franchise Agreement. (Saladworks Reply at 4; *see also* Saladworks Mem. at 11-12.)

As an initial matter, the Court notes that whether the implied covenant of good faith and fair dealing applies to the Franchise Agreement at all is far from settled under Pennsylvania law.[3] *See, e.g., Ash v. Continental Ins. Co.,* 593 Pa. 523, 932 A.2d 877, 883 n.2 (Pa. 2007) (acknowledging that "case law indicates considerable disagreement over the applicability of the implied duty of good faith"); *Bishop v. GNC Franchising LLC,* 403 F. Supp. 2d 411, 417-18 (W.D. Pa. 2005) (describing uncertainty in Pennsylvania law regarding application of the covenant of good faith and fair dealing to franchise agreements).  Because Defendants' argument focuses on the application of the covenant to specific contractual provisions—not the contract as a whole—the Court assumes for purposes of these motions that, under Pennsylvania law, the Franchise Agreement includes an implied covenant of good faith and fair dealing.

---

[3] The Franchise Agreement contains a choice-of-law provision, which states that Pennsylvania law governs the Agreement.  (*See* Rubenstein Decl. at Ex. A, § 18.1.)

The covenant of good faith and fair dealing requires "honesty in fact in the conduct or transaction concerned." *Benchmark Grp., Inc. v. Penn Tank Lines, Inc.,* 612 F. Supp. 2d 562, 583 (E.D. Pa. 2009). It serves as "an interpretive tool to determine the parties' justifiable expectations in the context of a breach of contract action." *Northview Motors, Inc. v. Chrysler Motors Corp.,* 227 F.3d 78, 91-92 (3d Cir. 2000). "Although the precise contours of a party's duty under the covenant vary with the context, good faith generally entails 'faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.'" *Benchmark Grp.,* 612 F. Supp. 2d at 583 (quoting *Curley v. Allstate Ins. Co.,* 289 F. Supp. 2d 614, 617 (E.D. Pa. 2003)). Examples of bad faith, on the other hand, include "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." *Mack Trucks Inc. v. BorgWarner Turbo Sys., Inc.,* 508 Fed. App'x 180 (3d Cir. 2012) (quoting *Kaplan v. Cablevision of PA, Inc.,* 448 Pa. Super. 306, 317, 671 A.2d 716 (Pa. Super. Ct. 1996)).

To plead a claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must properly plead the elements of a breach of contract claim. *CRS Auto Parts, Inc. v. National Grange Mut. Ins. Co.,* 645 F. Supp. 2d 354, 369 (E.D. Pa. 2009) (citation omitted). That is, a plaintiff must allege the existence of a contract, "that defendants failed to comply with the covenant of good faith and fair dealing by breaching a specific duty imposed by the contract *other than the covenant of good faith and fair dealing*," and resultant damages. *Id.* (citation omitted) (emphasis in original). Notably, the covenant of good faith "cannot be used to override an express contractual term." *Northview Motors,* 227 F.3d at 91.

Under these standards, Plaintiffs have sufficiently pled a claim for breach of contract: they alleged the existence of a contract (the Franchise Agreement), specific contractual provisions other than the duty of good faith and fair dealing that Saladworks allegedly breached, and resultant damages.  (*See* SAC ¶¶ 175-80.)  The Court disagrees, for the most part, with the Saladworks Defendants' contention that Plaintiffs' allegations use the implied covenant to vary the specific terms of the Franchise Agreement (*see* Saladworks Mem. at 11-12).  Nearly all of the contract provisions Plaintiffs cite endow Saladworks with discretion over some aspect of its performance under the contract.  (*See, e.g.,* Rubenstein Decl. at Ex. A, § 7.8.1 ("Franchisor has the right to change Franchisor's standards and specifications in Franchisor's discretion."); *id.* § 12.2.1 ("Franchisor will make a good faith effort to expend Brand Development Fund contributions in the general best interests of the System on a national or regional basis."); *id.* § 6.7 ("Franchisor will provide Franchisee continuing consultation and advice as Franchisor deems necessary and appropriate regarding the management and operation of the Restaurant.").)  If, as Plaintiffs allege, Saladworks did not exercise that discretion in good faith, it may be liable for breach of contract.

Not all of Plaintiffs' breach of contract allegations, however, pass muster.  Two contractual provisions that Plaintiffs cite—Sections 6.4 and 7.9—do not involve Saladworks' exercise of discretion.  (*See* SAC ¶¶ 175-76.)  Section 6.4 of the Franchise Agreement requires Saladworks to "furnish Franchisee with the name of its designated and/or approved design and architectural services vendor" and other specifications.  (Rubenstein Decl. at Ex. A, § 6.4.)  It does not, however, govern Saladworks' selection of vendors or other specifications.  (*Id.*)  Section 7.9, moreover, covers the *franchisee's* obligations to offer certain products for sale, but does not govern Saladworks' performance.  (*Id.* § 7.9.)  Plaintiffs, therefore, cannot premise their

breach of the implied covenant of good faith and fair dealing claim on these specific provisions. Additionally, Plaintiffs cannot premise their breach of the implied covenant of good faith and fair dealing claim on paragraph 179 of the Complaint—in which Plaintiffs allege generally that Saladworks failed to deliver on its promise to provide a successful franchise "System" for operating an established and successful "Restaurant" (*see* SAC ¶ 179)—because Defendants' alleged breach does not relate to a specific duty that the Franchise Agreement imposes. *See CRS Auto Parts,* 645 F. Supp. 2d at 369 (the plaintiff must plead that "that defendants failed to comply with the covenant of good faith and fair dealing by breaching a specific duty imposed by the contract *other than the covenant of good faith and fair dealing*" (emphasis in original)). The Court, therefore, grants the Saladworks' motion to dismiss Count VII in part and denies it in part without prejudice.

## C. David and Denise Wojcik Have Standing to Assert Tort Claims in Their Individual Capacities

"Illinois follows the widespread rule that an action for harm to the corporation must be brought in the corporate name."[4] *Frank v. Hadesman & Frank, Inc.,* 83 F. 3d 158, 160 (7th Cir. 1996) (collecting cases). Under this rule, a shareholder generally may not bring suit in an individual capacity for harms done to the corporation. *Davis v. Dyson,* 387 Ill. App. 3d 676, 710, 326 Ill. Dec. 801, 900 N.E.2d 698 (Ill. App. Ct. 2008). An exception exists, however, that "allow[s] a shareholder with a direct, personal interest in a cause of action to bring suit even if the corporation's rights are also implicated." *Cashman v. Coopers & Lybrand,* 251 Ill. App. 3d 730, 733, 191 Ill. Dec. 317, 623 N.E.2d 907 (1993) (quoting *Franchise Tax Bd. v. Alcan*

---

[4] "Although federal law generally controls the question of standing," the question of "whether a shareholder's claims are derivative or direct for purposes of the shareholder standing rule is controlled by the law of the state of incorporation, in this case, Illinois." *Rawoof v. Texas Petroleum Co., Inc.,* 521 F.3d 740, 762 (7th Cir. 2008) (citing *Massey v. Merrill Lynch & Co., Inc.,* 464 F.3d 642, 645 (7th Cir. 2006)).

*Aluminum Ltd.,* 493 U.S. 331, 336, 110 S. Ct. 661, 107 L. Ed. 2d 696 (1990)).  To fall within this

exception, a shareholder must allege (1) "an injury that is separate and distinct from that suffered

by other shareholders," *Davis,* 387 Ill. App. 3d at 710, 326 Ill. Dec. 801, 900 N.E.2d 698

(internal quotations omitted), or (2) that "the [defendant's] wrongful acts are not only against the

corporation but are also violations of a duty arising from a contract or otherwise, and owed

directly by the wrongdoer to the stockholders."  *Zokoych v. Spalding,* 36 Ill. App. 3d 654, 663,

344 N.E.2d 805 (Ill. App. Ct. 1976).

     The Saladworks Defendants argue that even if Salads of Schaumburg's claims survive

dismissal, the Court must dismiss David and Denise Wojcik's individual claims because "a

corporation's owners cannot bring suit as individuals for harm done to the company."

(Saladworks Mem. 12-13 (citing *Cashman v. Coopers & Lybrand,* 623 N.E.2d 907, 909 (Ill.

App. Ct. 1993).)  Plaintiffs appear to concede that David and Denise Wojcik do not have

standing to assert the breach of contract count.  (*See* R. 63 at 15 ("The Defendant is confusing

claims for breach of contract (which may only be brought by the contracting party) and claims

for fraud, which can be asserted by any party that is a victim of the fraud.").  The Court,

therefore, dismisses Count VII to the extent it includes breach of contract claims asserted in the

Wojciks' individual capacities since the Wojciks were not parties to the contract.

     With respect to the fraud counts, the Complaint alleges that the Wojciks suffered

individual harm distinct from the harm to the corporation.  Specifically, Plaintiffs allege that if

not for Defendants' fraud, David Wojcik would not have created a Saladworks franchise to begin

with, and Denise Wojcik would not have invested $90,000 in the "franchise opportunity" to pay

Saladworks' franchise fee.  (SAC ¶¶ 33-34, 43.)  Defendants, moreover, directed nearly all of

their alleged wrongdoing to David Wojcik individually, rather than to the corporation—indeed,

Salads of Schaumburg did not even exist at the time of most of Defendants' alleged misrepresentations. These allegations sufficiently show that the Wojciks suffered individual harm distinct from the harm to their corporation. *See Mann v. Kemper Fin. Cos., Inc.,* 247 Ill. App. 3d 966, 979-80, 187 Ill. Dec. 726, 618 N.E.2d 317 (Ill. App. Ct. 1992) (reversing dismissal of fraud claims brought in mutual fund investors' individual capacities where they alleged that the defendants' fraudulent prospectuses induced them to invest in the fund); *eOnline v. Chicago Consulting Partners,* No. 01 C 1918, 2002 WL 484865, at *7 (N.D. Ill. Mar. 29, 2002) ("[F]raudulent representations made for the purpose of inducing shareholders to agree to the sale of the assets, and made directly to shareholders by the corporation, [are] proper allegations of individual shareholder injury." (quoting *Mann,* 247 Ill. App. 3d at 976, 187 Ill. Dec. 726, 618 N.E.2d 317)).

In *Mann,* investors in two mutual funds filed a class action against the funds' manager alleging claims for common law fraud and consumer fraud, among others, arising out of alleged misrepresentations the defendants made in marketing materials for the funds. 247 Ill. App. 3d at 971, 187 Ill. Dec. 726, 618 N.E.2d 317. The plaintiffs asserted that the defendants' misrepresentations fraudulently induced them to invest in the mutual funds. *Id.* at 973. After surveying relevant case law, the Illinois appellate court held that because the mutual fund could not have brought the claims at issue on behalf of its investors, the plaintiffs had standing to assert those claims in their individual capacities. *Id.* 979-80. After all, "only the plaintiffs and other investors who invested in the securities, and not the mutual funds, could allege that misrepresentations in prospectuses induced them to invest." *Id.* at 980. The same is true here: the Wojciks allege that Saladworks' misrepresentations induced them to invest in a Saladworks'

franchise.  The Wojciks, therefore, have standing to assert their fraud claims in their individual capacities.

**III.    SDI's Motion to Dismiss**

SDI moves to dismiss Count IV for conspiracy to commit fraud and Count VI for negligent misrepresentations on the following grounds: (1) Plaintiffs released their claims against Saladworks, which bars Plaintiffs' claim against SDI for allegedly conspiring with Saladworks; (2) Plaintiffs failed to plead a conspiracy to commit fraud with particularity; and (3) Plaintiffs failed to plead SDI's alleged misrepresentations and Plaintiffs' reliance on them.  SDI's argument regarding Plaintiffs' purported releases fails for the same reasons as Saladworks' argument.  (*See* Parts I & II.A *supra*.)  The Court now turns to SDI's arguments attacking the sufficiency of Plaintiffs' allegations.

**A.    Plaintiffs Fail to Plead a Claim for Conspiracy to Commit Fraud**

Illinois law defines civil conspiracy as "a combination of two or more persons for the purpose of accomplishing by concerted action either an unlawful purpose or a lawful purpose by unlawful means." *McClure v. Owens Corning Fiberglas Corp.,* 188 Ill. 2d 102, 133, 241 Ill. Dec. 787, 720 N.E.2d 242 (Ill. 1999).  To state a claim for civil conspiracy under Illinois law, a plaintiff must allege (1) an agreement to accomplish an unlawful purpose or a lawful purpose by unlawful means, (2) a tortious act committed in furtherance of that agreement, and (3) an injury. *Reuter v. MasterCard Int'l, Inc.,* 397 Ill. App. 3d 915, 927, 337 Ill. Dec. 67, 921 N.E.2d 1205 (Ill. App. Ct. 2010).  The agreement is "a necessary and important" element of a conspiracy claim.  *Id.* (quoting *Adcock v. Brakegate, Ltd.,* 164 Ill. 2d 54, 62, 206 Ill. Dec. 636, 645 N.E.2d 888 (Ill. 1994)).

Civil conspiracy is an intentional tort and it "requires proof that a defendant 'knowingly and voluntarily participate[d] in a common scheme to commit an unlawful act or a lawful act in an unlawful manner.'" *McClure,* 188 Ill. 2d at 133, 241 Ill. Dec. 787, 720 N.E.2d 242 (quoting *Adcock,* 164 Ill. 2d at 62, 206 Ill. Dec. 636, 645 N.E.2d 888). "[A] defendant who innocently performs an act which happens to fortuitously further the tortious purpose of another is not liable under the theory of civil conspiracy." *Adcock,* 164 Ill. 2d at 54 206 Ill. Dec. 636, 645 N.E.2d 888. "Accidental, inadvertent, or negligent participation in a common scheme does not amount to conspiracy[,]" nor does a defendant's "[m]ere knowledge of the fraudulent or illegal actions of another." *McClure,* 188 Ill. 2d at133-34, 241 Ill. Dec. 787, 720 N.E.2d 242 (citations omitted).

In federal court, a claim for conspiracy to commit fraud must meet the heightened pleading standard that Rule 9(b) imposes. *See* Fed. R. Civ. P. 9(b); *Cincinnati Life Ins. Co. v. Beyrer,* 722 F.3d 939, 948-49 (7th Cir. 2013); *Borsellino v. Goldman Sachs Grp., Inc.,* 477 F.3d 502, 509 (7th Cir. 2007). The complaint, therefore, must allege with particularity "the nature of the purported agreement to defraud plaintiffs, such as when it was made or which individuals . . . arranged the conspiracy." *Id.* Merely alleging that the defendants "agreed," without providing the "critical details" of the alleged agreement, is insufficient to plead a conspiracy. *See id.*; *Sterling Fed. Bank, F.S.B. v. Credit Suisse First Boston Corp.,* No. 07-C-2922, 2008 WL 4924926, at *9 (N.D. Ill. Nov. 14, 2008) (citing *Borsellino*, 477 F.3d at 509); *see also Cooney v. Rossiter,* 583 F.3d 967, 971 (7th Cir, 2009) (affirming dismissal where complaint "is bereft of any suggestion, beyond a bare conclusion, that the remaining defendants were leagued in a conspiracy with the dismissed defendants").

Paragraph 149 of the Complaint—the sole allegation regarding SDI's and Saladworks' alleged agreement to defraud—states:

On a date unknown to Plaintiffs, Defendants, SDI and Saladworks, acting through their respective officers or employees, entered into an actual or tacit agreement to commit fraud against Saladworks franchisees such as the Plaintiffs in this case, who would be duped into investing their money into the development of Saladworks restaurants in new markets in which Saladworks did not have a successful presence and/or into new an unproven versions of a Saladworks restaurant.

(SAC ¶ 149.)  Plaintiffs argue, without citation to any legal authority, that this allegation "is more than sufficient" to plead a conspiratorial agreement.  (R. 50 at 6.)  The Court disagrees. Plaintiffs have not alleged any of the "critical details"—the "who, what, when, where, and how"—of the conspiracy.  *See Borsellino,* 477 F.3d at 507, 509; *see also Cooney,* 583 F.3d at 971 (affirming dismissal of a conspiracy claim where the complaint contained no suggestion, "beyond a bare conclusion," that the defendants "were leagued in a conspiracy"). Indeed, paragraph 149, when stripped of excess verbiage, provides no more than the kind of "bare conclusions" of conspiracy that courts have consistently held are insufficient to state a claim. *See, e.g., Cooney,* 583 F.3d at 971; *Borsellino,* 477 F.3d at 509 (affirming dismissal of a conspiracy to defraud count where "the complaint tells . . . nothing about the nature of the purported agreement to defraud"); *S & A Futures, LLC—Series 2 v. Sysco Chi., Inc.,* No. 11 C 7629, 2012 WL 851556, at *8-9 (N.D. Ill. Mar. 13, 2012) (dismissing conspiracy claim because although the complaint "reference[d] a purpose and activity for the alleged conspiracy, it include[d] nothing about the alleged conspiracy among the defendants beyond the conclusory statements that the defendants 'agreed' and 'act[ed] in concert').

In addition to failing to allege an "agreement," Plaintiffs also fail to allege that SDI "knowingly and intentionally" participated in a scheme to defraud Plaintiffs.  *Adcock,* 164 Ill. 2d at 54, 206 Ill. Dec. 636, 645 N.E.2d 888.  Plaintiffs argue that the allegations in the Complaint regarding SDI's pre-existing relationship with Saladworks and the myriad of alleged problems with the restaurant site SDI recommended are sufficient to give rise to a plausible inference of

intent to defraud. (*See* R. 50 at 6-8.) Not so. The allegations surrounding SDI's recommendation of the "Streets of Woodfield" site suggest negligence, at most, not an intent to defraud. *See Damato v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 878 F. Supp. 1156, 1162 (N.D. Ill. 1995) ("Allegations of negligent conduct are . . . insufficient to support a fraud claim."); *see also Adcock,* 164 Ill. 2d at 64, 206 Ill. Dec. 636, 645 N.E.2d 888 ("There is no such thing as accidental, inadvertent or negligent participation in a conspiracy."). Furthermore, SDI's pre-existing relationship with Saladworks, without more, does not create a plausible inference of an intent to defraud. *See Twombly,* 550 U.S. at 556-57, 127 S. Ct. 1955, 167 L. Ed. 2d 929 ("Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.").; *see also Borsellino,* 477 F.3d at 509 (requiring the plaintiffs to allege more than just the business relationships among the alleged co-conspirators and "a handful of unreasonable inferences" to plead their claim for conspiracy to defraud). The Court, therefore, dismisses Plaintiffs' conspiracy claim without prejudice.

**B.      Plaintiffs Adequately Plead a Claim for Negligent Misrepresentation**

To state a claim for negligent misrepresentation under Illinois law, a plaintiff must allege: "(1) a false statement of material fact; (2) carelessness or negligence in  ascertaining the truth or falsity of the statement by the party making it; (3) an intention to induce the other party to act; resulting from such reliance; (4) action by the other party in reliance on the truth of the statement; (5) damage to the other party resulting from such reliance; and (6) a duty on the party making the statement to communicate accurate information." *First Midwest Bank, N.A., v. Stewart Title Guar. Co.,* 218 Ill. 2d 326, 334-35 300 Ill. Dec. 69, 843 N.E.3d 327 (Ill. 2006) (citations omitted). Where a plaintiff seeks purely economic damages, a party has a duty to

avoid negligently conveying false information only if the party is in the business of supplying information for the guidance of others or their business transactions. *Id.* at 335. Courts measure the adequacy of negligent misrepresentation claims against the general pleading standard set forth in Rule 8, not the heightened pleading standard in Rule 9(b). *Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP,* 475 F.3d 824, 833, 838 (7th Cir. 2007).

Plaintiffs allege all of the elements of their negligent misrepresentation claim. Plaintiffs allege that SDI, as a professional site selection and franchise development firm, was in the business of supplying information to Plaintiffs and, therefore, owed a duty to provide accurate information. (SAC ¶¶ 167-68.) They further alleged that SDI breached its duty to provide accurate information by "falsely represent[ing], both by affirmative misrepresentations and by omission, that [SDI] had the requisite competence, qualifications, experience, and credentials to provide architectural services to the prospective franchisee" (*id.* ¶ 170) and by failing to disclose material information about the "Streets of Woodfield" location CDI recommended to Wojcik. (*Id.* ¶¶ 51, 54, 58-60.) Finally, Plaintiffs allege that they relied on SDI's misrepresentations and omissions and suffered damages as a result. (*See id.* ¶¶ 171-72.) Plaintiffs, therefore, have adequately pled their claim for negligent misrepresentation.

SDI attacks Plaintiffs' negligent misrepresentation claim on three fronts. First, SDI argues that the Plaintiffs' claim fails because Plaintiffs fail to identify any affirmative misrepresentations that SDI made. (SDI Mem. at 11-12; *see also* SDI Reply at 6-7.) Because Rule 9(b) does not apply to claims for negligent misrepresentation, however, Plaintiffs need not plead the particulars of SDI's alleged misrepresentations. *See Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP,* 475 F.3d at 833, 838. Rule 8 requires only that Plaintiffs plead sufficient facts to give Defendants fair notice of their claims and to state a plausible claim for

relief.  Fed. R. Civ. P. 8(a); *Twombly,* 550 U.S. at 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929.

Plaintiffs' allegations meet this standard.

Second, SDI argues the Court should dismiss Plaintiffs' negligent misrepresentation

claim because SDI's alleged misrepresentations consist of non-actionable statements of opinion

or predictions of future events, not statements of fact.  (*See* SDI Mem. at 13-14; *see also* SDI

Reply Br. at 6-7.)  The Court disagrees.  "[W]hether a statement is one of fact or opinion

depends on the factual circumstances."  *Costello v. Grundon,* 651 F.3d 614, 639 (7th Cir. 2011);

*see also Rasgaitis v. Waterstone Fin. Grp., Inc.,* 2013 IL App. (2d) 111112, 368 Ill. Dec. 814,

985 N.E.2d 621, 634 (Ill. App. Ct. 2013) ("Whether a statement is one of fact or of opinion

depends on all the facts and circumstances of a particular case.").  "[T]he general rule is that it is

not 'the form of the statement which is important or controlling, but the sense in which it is

reasonably understood.'"  *Rasgaitis,* 2013 IL App. (2d) 111112, 368 Ill. Dec. 814, 985 N.E.2d at

634 (quoting *West v. Western Cas. & Sur. Co.,* 846 F.2d 387, 394 (7th Cir. 1988)).  Because the

alleged representations and omissions at issue may fall into either the "fact" category or

"opinion" category depending on the context, the Court cannot resolve this issue at the motion to

dismiss stage.

Third, SDI argues that Plaintiffs' negligent misrepresentation claim fails because

Plaintiffs cannot plead reliance.  (*See* SDI Mem. at 13.)  SDI argues that Plaintiffs used SDI as

their site selection consultants because the Franchise Agreement required them to do so, not

because Plaintiffs chose to use SDI based on SDI's alleged misrepresentations.  (*Id.*)  SDI's

argument comes up short.  Even if Plaintiffs did not rely on SDI's alleged misrepresentations in

selecting SDI as their site selection consultant, the allegations in the Complaint support a

plausible inference that Plaintiffs relied on SDI's alleged expertise and misrepresentations in

choosing the "Streets of Woodfield" site and in continuing to invest additional time and money into the restaurant, which, Plaintiffs assert, was a lost cause from the start. (*See* Compl. ¶¶ 51, 54, 58-60, 62.) Thus, Plaintiffs have adequately pled reliance.

## CONCLUSION

For the reasons stated above, the Court grants in part and denies in part Plaintiffs' motion to strike, and strikes Exhibits B-E and all arguments based on those exhibits from Defendants' briefs. The Court also grants in part and denies in part the Saladworks Defendants' and SDI's motions to dismiss. Plaintiffs may file a Third Amended Complaint on or before November 20, 2013, consistent with this Opinion.

**DATED:** November 4, 2013

**ENTERED**

_____
AMY J. ST. EVE
U.S. District Court Judge